55 So.2d 641 (1951)
GALIANO
v.
OCEAN ACCIDENT & GUARANTEE CORPORATION, Ltd.
No. 19745.
Court of Appeal of Louisiana, Orleans.
December 10, 1951.
Rehearing Denied January 7, 1952.
Writ of Certiorari Denied February 18, 1952.
*642 Frank T. Doyle, Robert G. Hughes, and Maurice D. Armagnac, all of New Orleans, for plaintiff and appellant.
Gordon Boswell and Stanley E. Loeb, New Orleans, for defendant and appellee.
McBRIDE, Judge.
This suit, which involves the claim of Joseph Galiano against The Ocean Accident & Guarantee Corporation, Ltd., the automobile liability insurer of Enest Buquet, is for the sum of $46,345.00, for personal injuries together with resultant expenses and loss, arising out of an automobile accident. This and three other suits, involving claims growing out of the same accident, all originated in the Twenty-fourth Judicial District Court for the Parish of Jefferson, and were consolidated for trial, the hearing thereon consuming two full days.
Galiano has appealed from the judgment of the trial court dismissing his suit.
The accident in question happened about one o'clock, p. m., on Christmas Day, 1949, which was warm, dry, and clear, when two automobiles moving in opposite directions collided head-on in a curve in the Marrero-Barataria road (State Highway 30), which runs east and west between the Town of Marrero on the east and the Town of Barataria on the west. The collision occurred near Crown Point Village, which is about midway between the two towns. The road at the point of collision is a twenty-foot wide black-topped strip, flanked by a five and one-half foot shoulder on its north side and an eight and three-quarter foot shoulder on its south side; the road has no delineating stripe in the center. The apex of the curve in which the accident occurred is southward from the east-west course of the road.
The west-bound automobile was a 1950 Ford sedan, driven by Galiano on the inside of the curve. The owner of the car, Jesse J. St. Amant, was riding alongside Galiano in the front seat. The east-bound automobile, a 1941 Ford coupe, was owned by Enest Buquet, and at the time of the collision it was being driven by his minor son, Henry, age nineteen, along the outside of the curve; four young men, aged from sixteen to twenty-two, were passengers in the Buquet car, two riding on the front seat with Buquet and two on the rumble seat.
The petition charges that young Buquet was driving to the left of the center of the highway at an excessive rate of speed. The defense is that Buquet was free from negligence, and in the alternative the plea is made that Galiano, St. Amant's driver, was guilty of contributory negligence in several respects, more particularly because he drove his car diagonally across the highway into the Buquet car.
The controlling question presented is whether Galiano or Buquet was driving in the wrong lane, in broad daylight, on the twenty-foot wide roadway. There is not even a remote suggestion of contention that both vehicles overlapped the center of the roadway. Galiano accuses Buquet of being on his side of the roadway, while the defendant contends that the St. Amant car was the offender.
Our attention is at first attracted to the testimony given by seven disinterested witnesses, who appeared at the scene before the wrecked automobiles had been moved, which shows that the fronts of the vehicles were locked or joined together on Buquet's side of the road. They were finally disentangled through the media of a wrecker and a truck, which pulled them apart.
Divested of minor unimportant inconsistencies, the testimony of Henry Buquet *643 and his four passengers is in harmony, and to the effect that the Buquet automobile, when struck, was traveling on its right-hand side of the road at not more than twenty-five miles an hour, and that the St. Amant car came diagonally across the road and crashed into it.
Buquet says that the St. Amant car was swerving, and that it came over to the left side, then went over to the right, and then again came to the left side of the road, striking the Buquet car. Bruce also told of seeing the St. Amant car zigzagging. The other two passengers did not sight the St. Amant car until just before the impact, but they are in accord that it ran diagonally across the road, and its driver apparently made no effort to avoid striking the Buquet car.
In argument, appellant's counsel dwelt at some length on what he considers glaring inconsistencies in the testimony of the five young men, and points out that they are in disagreement as to the exact spot in the curve at which the accident occurred. We attach no importance to counsel's argument, being satisfied that the cars crashed somewhere near the peak of the curve. Our attention is also called to the fact that young Buquet gave conflicting estimates as to how far away the St. Amant car was when he first saw it, and counsel reasons that had Buquet timely applied his brakes when he first observed the St. Amant car the accident would have been averted. Buquet, however, made reasonable explanation when he stated that he applied his brakes only when Galiano came back to the left side of the road the second time. The automobiles were then undoubtedly in close proximity.
It is also claimed that Buquet and his passengers had been drinking before the accident. Although each denied having partaken of anything but a soft drink, a deputy sheriff, who appeared on the scene after the collision, sensed the odor of liquor on them. However, be that as it may, there is not a syllable of evidence in the record which would warrant a conclusion that any of these young men were under the influence of liquor.
On the date of the occurrence, Galiano and St. Amant, after eating dinner at the home of a relative of the latter, drove to a store in St. Amant's automobile, which was but a few weeks old, and the wreck occurred whilst they were returning to the relative's residence. St. Amant permitted Galiano to drive the car, as Galiano had never operated an automobile equipped with overdrive and "he wanted to see how it handled."
According to St. Amant, when they entered the curve he "was looking down toward the floor at the speedometer" discussing with Galiano the overdrive, which had been set to become effective at thirty-eight miles an hour. Although maintaining that the car was on its right side of the road, he could relate nothing regarding the accident.
The only testimony challenging that of the occupants of the Buquet automobile emanates from Galiano himself. He asserts that he saw the Buquet car about fifty or sixty feet away when "I made the curve," and that it was in the center of the road angling toward him. He insisted that he was on the right-hand side of the road.
To say the least, Galiano's testimony is materially weakened, if not entirely destroyed, by the recitals of a written statement allegedly signed by him in Charity Hospital on December 26 or 27, 1949. On cross examination, Galiano was confronted with the statement, which in part recites: "* * * I was traveling at about 35 to 40 m. p. h. in a curve in my lane when I momentarily turned to say something to Stamand (St. Amant). When I turned around I saw another car coming towards me at a very short distance. As far as I remember I wasn't exactly on my side of the road, but instead a little towards the center, I swerved to the right, but in the next fraction of the second I felt a terrific impact. Our car hit head on mostly on my left front. * * *"
Duda, an adjuster for the defendant, identified the statement, which he stated he wrote at Galiano's bedside in the hospital after having questioned Galiano. The *644 document, which consists of two pages, was then handed to Galiano, who read it through and then signed each page. Galiano was interrogated three times relative to the authenticity of the statement. At first he attempted to disavow the interview with Duda in its entirety by testifying that his injured mouth and tongue precluded his talking to Duda, and, too, that he was in a semiconscious state. He would never admit that the statement bears his signatures, but he did concede that one of the signatures looked like his, but expressed doubt as to the other. He finally said, "I don't deny I made the statement; I just don't remember making" it.
We are convinced that Galiano was not in such a condition as he pretends, and that the statement was freely made and signed by him. Galiano and young Buquet occupied adjacent beds in the hospital, and on December 26 the elder Buquet, who was on a visit to see his son, went over to Galiano's bed and, after introducing himself, "chatted" with him. On that same night he again visited Galiano, who discussed the accident with him. Young Buquet also said he heard Duda speaking with Galiano. Two of the nurses on duty at the time testified that the patient's chart contained no notation of Galiano's unconsciousness, or of opiates or sedatives having been administered to him. It was explained that if Galiano had been unconscious, or if he had received such medication, it would have been "charted."
The statement made in the hospital, in which Galiano admitted "I wasn't exactly on my side of the road," effectively impeaches his sworn testimony. There is no room for doubt that a court has the right to consider a statement of a litigant made after an accident, despite the fact that the statement is retracted in his sworn testimony. In the light of facts evinced by the record, prior statements may sometimes conclusively impeach and be entitled to greater credence than testimony given from the witness stand. Passera v. U. S. Guarantee Co., La.App., 187 So. 345; Bartholomew v. Impastato, La.App., 12 So.2d 700.
Appellant's counsel also advances the theory that when two automobiles collide in a curve the force of the impact tends to move both cars to the outside, and that the positions of the automobiles in the instant case after the accident demonstrate that it was Buquet who was offside. The answer to that contention is self-evident. It is almost impossible for one to calculate with any degree of precision the behavior of vehicles after a collision. That fact was recognized by us in Waguespack v. Savarese, La.App., 13 So.2d 726, 729. There, like in the present case, automobiles moving in opposite directions were in head-on collision, and we said in the course of our opinion, "* * * it is hard to understand how these cars could have come to rest in those positions * * *."
The physical evidence, plus the testimony of the occupants of Buquet's car and the admissions made by Galiano in his written statement, eloquently bespeak Galiano's negligence in operating the St. Amant car on the wrong side of the roadway. Not alone that, but St. Amant's testimony clearly indicates that Galiano was more interested in the mechanism of the new automobile than in the driving of the car.
Only a question of fact is involved, and our conclusions coincide with those of the lower court. But even if we entertained doubt as to the correctness of the findings of our brother below, we would hesitate, in the absence of manifest error, to disturb the judgment. In Lambert v. Caruso, La.App., 149 So. 116, we considered a claim growing out of an accident similar to this one. As the testimony was "wholly irreconcilable" we observed: "* * * The learned judge below believed the defendant and resolved the doubt created by the conflicting evidence in his favor, giving judgment accordingly, and we are unable to say that in doing so he committed manifest error. The case appears to us as one peculiarly within the oft-stated doctrine to the effect that the judgment of the trial court on a question of fact will not be disturbed unless palpably erroneous."
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.