McBRIDE, Judge.
Ernest W. Patrick, who was employed as a special officer by the Texas Pacific-Mis *191 souri Pacific Terminal Railroad of New Orleans, died as a result of injuries received by falling from a wharf on the river front in Westwego, owned by his employer, to the deck of the SS Utahan, which was at the time being unloaded 'by T. Smith & Sons, Inc., stevedores. The accident occurred on February 21, 1944.
Plaintiff, the widow of the deceased, on her own behalf and for the use and benefit of her four minor children, issue of her marriage with Patrick, seeks recovery of $83,523.00 for his death. The suit was directed against T. Smith & Sons, Inc., and its public liability insurer; Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans; and Grace Line, Inc., all solidarily. Plaintiff subsequently compromised her claims against the railroad company for $4500.00, and voluntarily abandoned her demands against Grace Line, Inc. The only defendants before us are T. Smith & Sons, Inc., and its liability insurer, who have appealed from an adverse judgment for $21,-$500.00.
Patrick’s duties required that he keep a lookout over the wharf, to be on guard against fires, theft, pilferage, acts of damage, disturbances, etc. He was also charged with regularly inspecting the wharf’s outer pilings. At the time of the accident the United States was at war, and the wharf was under the jurisdiction of the Army, and special alertness seems to have been the order of the day for all watchmen. A month or so prior to the fatal accident, Patrick had received a directive from the chief special agent of his employer admonishing him to exert extreme care in guarding against all forms of damage and sabotage. This directive, dated January 1, 1944, is part of the record. Patrick was therein given to understand that if, during his rounds, he discovered any damage, attempted damage, or sabotage on his beat, he should get in touch with the chief special agent, whose telephone numbers were mentioned in the directive.
The accident happened at 11:30 a. m. on the above date, and Patrick died soon after falling from Wharf No. 2 to the deck of the Utahan (about ten feet below) which was docked alongside the wharf in the Mississippi River with its bow pointed upstream. The vessel was at the time being unloaded of balsa wood by T. Smith & Sons, Inc., engaged in the stevedoring business.
The wharf, which is of considerable length, rests on pilings and extends out into the river; on the land side is an enclosed shed, from the edge of which there extends outward an uncovered “apron.” At the edge of the apron there are two “stringers.” The inside stringer, twelve inches wide .by twelve inches deep, is composed of four 3xl2-inch boards affixed to each other, the edges of the boards constituting the top of the stringer, and rests against the outer edge of the apron. The outside stringer is only nine inches wide by twelve inches deep. Separating the stringers are the outer pilings of the wharf, spaced about nine feet apart. There is a space of about one foot (the diameter of the pilings) between the stringers. The stringers are a few inches higher than the apron of the wharf; the pilings are leveled off even with the tops of the stringers.
As aforesaid, the Utahan was berthed alongside the outer stringer. The balsa wood, light of weight, was in packages of varying sizes held together by metal bands or straps. Nothing in the record shows the length or width of the wood, but from a photograph which is part of the evidence it appears that the packages were of rectangular shape and composed of at least twelve boards placed flatwise on top of each other. The bundles are of large size, bulky, and undoubtedly of considerable weight.
The ship’s gear was employed in unloading the vessel; workmen in the hold would make a pile of several bundles of the balsa wood, around which was placed a “bridle” which consisted of a rope with a metal ring in the center and metal hooks on the ends. From the sketch contained in the record, we gather that the rope is laid on the bottom of the hold in the shape of the letter “V” with the metal ring at the apex. The lumber is then placed crosswise on the “V” and after the hooked ends of the rope are drawn around the pile the hooks are affixed to the rope near the metal ring. The cable of the gear is then attached to the ring and the *192 load hoisted, causing the hooks to slide down over the lumber, holding the load snugly within the bridle.
When a load is hoisted to a sufficient height, the boom swings over the side of the ship and deposits the lumber lengthwise onto a “dolly,”- which is described as a flat-bottomed four-wheel wagon, seven or eight feet long by three feet wide. Dollies, coupled together in units of two, are pulled by a tractor called an “iron mule.” After the boom deposits a load on the ¡first dolly in the unit, the tractor is moved forward sufficiently to place the second dolly in position to receive the next load from the boom. After a load is deposited, a “load lander” releases the hoist cable from the ring of the bridle, and the bridle, which is permitted to remain around the lumber, is tightened by a half hitch knot for the purpose of keeping the load from coming apart or falling.'
Patrick was several feet from the spot where the dollies were being loaded. The dollies were from three to ten feet from the inside stringer. Some witnesses claim that Patrick was on the inside stringer, while others maintain that he stood on the outside stringer. There is also disagreement as to whether he stood with his back to the wharf.
Wood, a watchman in the service of the Navy, was produced by plaintiff as a witness. lie says he was about forty feet from Patrick and noticed him on the outside stringer, and saw him fall to the deck of the Utahan. According to Wood, when the second dolly passed Patrick the rope came loose and “the load split and part went one way and part went the other way, the top bundle came down and catapulted across the two stringers,” coming to rest “where -Mr. Patrick would have been standing had he not fallen.” When tjie rope slipped, Wood heard several men yell, “look out,” and “ * * * Mr. Patrick was looking forward into' the warehouse, he seemed to be observing something very closely when someone hollered and he looked and saw this load breaking up- and he threw his hands up as he saw the timber falling. It was involuntary as you would bat your eye and in that movement he lost his balance and fell backwards onto the ship.”
Wood was emphatic that the rope became unwrapped from the load of lumber; he saw it lying on the -floor of the wharf.
Brown, the winch operator, Mays and McLemore, load landers, and Venturella and Krummel, tractor drivers, were placed on the stand by plaintiff for cross examination. Mays and Krummel, at the time of the trial, were still in the employ of T. Smith & Sons, Inc. The composite of the testimony of these witnesses, who claim they saw the accident from varying distances, is that Patrick lost his balance and fell from the stringer. They uniformly asserted that the bridle rope slipped but did not become untied, and that the load “fell,” “shifted,” “spread,” “tilted,” or “broke,” on the dolly, but that the lumber did-not fall to the floor of the wharf and never extended far enough outside the dolly to reach anywhere near the point where Patrick' was standing. They generally agree that the lumber “fell,” “shifted,” “spread,” “tilted,” or “broke” while the first dolly was in the process of being pulled forward. One believed that the movement of the lumber occurred just about the moment the tractor stopped after pulling the first dolly forward.
There is ’ not a negative word demonstrating that Patrick’s fall did not immediately follow the slipping of - the rope around the lumber, which was located anywhere from five to ten feet from Patrick. When the rope slipped, Venturella says he “hollered” to Patrick to “look out,” and Brown makes the statement that he called, as he saw Patrick about to fall, “catch the man.” Mays heard no one call out. The witnesses maintain stoutly that it is not at all unusual for balsa wood to shift when being wheeled over the rough surface of the wharf, but that the shifting is not dangerous. The workmen attribute Patrick’s fall to an insecure position on a rotten portion of the stringer.
It is not clear how high the lumber was stacked, the estimates ranging from three to six feet. White,'the foreman, testifying *193 for the defense, says the load reached a height of about thirty inches above .the wharf. His testimony parallels that of the other witnesses with reference to the slipping of the rope. White, too, maintained that the load merely spread but did not fall off the dolly. At one point he professed not knowing what caused Patrick’s 'fall — -“I have often wondered that myself, why did -he fall.” Láter he was “sure that the fall was caused by the bad stringer on the wharf.”
The trial was held in the lower court during October, 1949, about four and one-half years after the accident. On cross examination the workmen, including White the foreman, were confronted with statements they made shortly after the accident. Brown, Mays, McLemore, Venturella, and Krummel each made two statements, one to the claim agent for the TP-MP Railroad, and the other to the adjuster of the insurer of T. Smith & Sons, 'Inc., at various times between February 22, 1944, and March 16, 1944. These statements cannot be reconciled with the sworn testimony, and the variations are of such a nature as to shroud the sworn testimony with suspicion.
Brown, to the railroad claim agent, said: “ * * * One of the watchmen was standing on the inside stringer the one near the warehouse. As the wood fell off the truck he must have thought it was going to strike him and he stepped backwards toward the outside stringer and as he did so he appeared to- lose-his balance and he swung .his arms around trying to regain his balance. * * * ” ■
Brown, to the insurer’s adjuster: “ * * * A man I think was a watchman was standing on the inside stringer about twelve inches above the apron oif the wharf. * * * The mule commenced pulling the load away moving up about fifteen feet, and the first load, which was about eight to ten feet away from the inside stringer where the watchman was standing, when the load buckled inside sling, which had just been tied and knotted by McLemore and Mays. The top two bundles slid over on the left side of the sling, and slid off side of trailer. By left side of trailer I. mean river side. The load fell about two or three feet away from where .the watchman was standing on inside stringer. * * 'Jf.H
Mays, to the ' railroad claim agent: “ * * * The rope on this load was new and it slipped, but it did not come untied. When it .slipped some of the top pieces toppled over toward the river and when it did so that caused the entire load to fall in the direction of the river. When the tractor driver yelled at the watchman he jumped backward toward the 'back stringer, which was only about one foot from the inside stringer, but he jumped too far and became overbalanced and fell backwards on the deck of the steamer below a fall of about 12 or IS feet I would say. * * * There is a bad place in the outside stringer, that is the outside board-of this stringer was in bad shape, in fact it was about 3 inches narrower’ than the inside stringer as it had • rotted away or had been worn away by ships striking it. The condition of this outside stringer did not cause the accident he just jumped too far back in an effort to avoid this load. When the wood fell the entire load dropped very near to the spot he had been standing, but I do not believe it would have struck him if he had stayed where he was. I was standing on the same side of the load as this watchman and was only about 6 or 8 feet from him when he if ell. I had a clear view from where I was standing. * * * This wood did not strike the top of the stringer he was standing on at all, but fell right by it, right in front of where he had been standing. * * * ”
Mays, to the insurance .company adjuster: “* * ,•* When .the tractor moved up, the two.top bundles of wood slipped over on the inside, and one rolled against the inside of the stringer. * * * ”
, McLemore, to the railroad claim agent: “ * * * The first wagon had been loaded and we -had just .completed the .loading of the second wagon and the tractor had j.ust started moving with the loads when all of a sudden some of the top bundles *194 of balsawood slipped out of the sling someway and fell. The entire load did not fall, but these fell in his direction and the tractor driver yelled at him to lookout. He took a step backwards toward the outside stringer and just stepped too 'far, became overbalanced and fell to the deck of the steamer. * * * When this load began to fall he threw up his hands and stepped bade, and looked like he was trying to keep the wood away from him when he fell. * * * ”
McLemore, to the insurer’s adjuster: “ * * * The truck pulled past me, when a couple of top bundles fell off, and toppled over towards me, and just rubbed me on the hip, as it fell off.
“ * * * the two top bundles slid over towards the cap, practically up against it. * * * ”
Venturella, in a supplemental statement to the railroad claim agent, said: “I said above that the load did not fall off the wagon, but I cannot be positive about that, as I was too excited at the time to remember all the details. * * * ”
Krummel, to the railroad claim agent: “ * * * but as this load broke loose some of the balsawood fell toward the wharf, some of it fell toward the river and some remained on the wagon. * * * When Venturella yelled at him he suddenly threw up his hands to try to ward off this wood when he lost his balance and fell backwards onto the deck o'f the boat below, a fall of about 10 or 12 feet. * * * the load on the leading wagon breaking caused him to throw up his hands and lose his balance. * * * In my opinion the wood did not strike him, it may have touched his hands. * * * ”
Krummel, to the insurer’s adjuster: “ * * * I am positive there were three piles of balsa wood lumber, 3 high on this wagon. I don’t know if the sling opened, but il know the rope didn’t break. Three bundles went towards the river, three towards the shed, and three stayed on the wagon. * * *”
White’s statement, made to the adjuster for the insurance company on April 19, 1949, recites, “I don’t recall if the wood fell to the wharf or not, * * * ”
It would serve no useful purpose whatever to point out in this opinion the material discrepancies to be found when comparing the testimony with the versions of the accident given shortly after its occurrence. We believe the statements eloquently attest that the witnesses changed altogether their views between the dates of the statements and the day oif trial.
Appellants’ counsel contend that whatever variance there may be is neither substantial nor material. It is argued that the statements should be discounted because they are not in the witnesses’ own words. The recitals of the statements are simple and characteristic, and we entertain no doubt that the narratives recited emanated from the witnesses, at a time when the pertinent details of the occurrence were fresh in their minds and at an unsuspicious time. Chambers, the railroad claim agent, identified the statements made to him, and testified that he reduced them to writing immediately, and they contain a recapitulation of what was said by the witnesses. We cannot overlook sight of the fact that one of the adjusters represented the TP-MP -Railroad, which was eliminated as a defendant after compromising plaintiff’s claims, and that the other adjuster represented T. -Smith & Sons’ liability insurance carrier, one of the appellants. We could never be made to understand why adjusters, interested only in obtaining true statements so as to assay their principals’ liability, intentionally would have introduced unfavorable matter into the statements if such was not given them by the persons from whom the statements were taken.
It is entirely reasonable to suppose that some variance might exist in the testimony of a witness and a statement made four and a half years before the trial, but it is inconceivable -how the statements of six witnesses could normally be so violently contradictory of their sworn testimony. The six employees of T. Smith & Sons, Inc., all admitted making statements and acknowledged their signatures, but postulated that the statements were in *195 correct because some of the details therein mentioned did not come from them. Our •opinion is that even though disavowed by the witnesses the statements- tell the true story of Patrick’s death. In the light of the facts evinced by the record, we think the prior recitals of the witnesses constitute conclusive impeachment of their sworn testimony. A court may give greater credance to a prior statement under such circumstances as we find here. See Passera v. U. S. Guarantee Co., La.App., 187 So. 345; Bartholomew v. Impastato, La.App., 12 So.2d 700; Galiano v. The Ocean Acc. & Guarantee Co., La.App., 55 So.2d 641.
The testimony of Wood impresses us. The only discrepancy we can' find therein is the assertion that the load fell from the second dolly, which is in itself of no importance. Wood’s evidence, considered along with the written statements oif the workmen and foreman, convinces us that when the wood fell from the dolly and rolled or catapulted toward Patrick, he in-stinctly threw up his arms to protect himself, lost his balance, and fell, sustaining injuries causing death. That a bundle of lumber came to rest at the point where Patrick was standing we have no doubt.
The petition alleges that when the wood fell Patrick, believing that he might be struck by the falling packs, threw up his arms as if to guard himself, causing him to lose his balance and fall. A charge of general negligence is leveled at T. Smith & -Sons, Inc., and “petitioner pleads the doctrine of res ipsa loquitor and her rights thereunder.” In the alternative, several specific acts of negligence are set forth, among which is that T. Smith & Sons’ agents and employees were negligent “in using a new rope, one that was likely to slip.”
In view oif the charge of general negligence, the doctrine of res ipsa loquitor enters the case. Horrell et al. v. Gulf & Valley Cotton Oil Co., Inc., 15 La.App. 603, 131 So. 709. The doctrine is applicable when the facts leave no room for any different presumption than that the defendant was negligent. The reasons for the rule are discussed in the leading case in this state on the subject, Lykiadopoulo v. N. O. & C. R. Light & Power Co., 127 La. 309, 53 So. 575. The unloading operations, as well as the equipment used, including the rope bridle and the dollies, were in sole charge of the employees of T: Smith & Sons, Inc. Oqly T. Smith & Sons, Inc., is able to explain the cause of the accident. The presumption is that there was negligence on the part of its workmen, and under the doctrine of res ipsa loquitur the burden was upon T. Smith & Sons, Inc., to exculpate itself from fault and liability. The doctrine has found applicability in various types of cases, e. g., where a bale oif paper fell from a dray, Pizzitola v. Letellier Transfer Co., La.App., 167 So. 158; where a portion of a hatch cover fell down the hold of a ship, Taylor v. United Fruit Co., 126 La. 568, 52 So. 770; where one of a stack of wheels fell, Mercer v. Tremont & G. Ry. Co., La.App., 19 So.2d 270.
The only explanation given by the workmen is that the rope slipped. Then, if this be true, the attempt of T. Smith & Sons, Inc., to absolve itself falls far short of the goal. If new rope was likely to stretch and slip, as the workmen admitted, they were surely cognizant of the dangerous potentialities. It seems to* us that they should have exercised commensurate care and caution by tying the ro'pe around the lumber in such a fashion as to make certain that an accident could not happen and cause injury to a person lawfully on the wharf. The specific charge of negligence mentioned is unmistakably made out by the testimony of the workmen themselves. But even if the lumber fell for any other reason or from another cause, in the absence of a showing that the workmen were free of fault the imputation of negligence would necessarily follow under the doctrine of res ipsa loquitur.
Thus having concluded that there Was negligence on the part of the agents of the stevedoring company, the question whether that negligence was the proximate cause of Patrick’s death must be discussed.
When the lumber rolled across the wharf in the direction of Patrick, he undoubtedly *196 considered himself to be, and we believe he was, in imminent danger of being struck, The employees of the stevedoring company; through their negligence, created a sudden emergency or peril, and Patrick, as any normal human being would have done under the circumstances, instinctively endeavored to shield himself from harm, and as a result lost his life.
The negligence of the workmen initiated a chain of causation culminating in Patrick’s fall. They should have foreseen that if the lumber was insecurely tied it would topple and create a situation of danger.
In the case of Ernst v. New Orleans Public Belt Railroad et al., La.App., 55 So.2d 657, 660, we were concerned with facts analagous in some respects to those under consideration in the instant case. There a locomotive coupled onto a cut of box cars just as an automobile-truck was passing over the track, and the end box car moved a distance of thirty inches into the street intersection, whereupon the driver of the truck, believing himself to be in danger, accelerated the speed of his vehicle to clear the track. A passenger riding in the truck was thrown to the ground and injured, and at his suit we allowed a recovery against the railroad on the theory that its agents had created an apparently dangerous situation, which caused the driver of the truck to react instinctively as would any normal and prudent person under like circumstances. We said; “* * * There is always within man the deep-seated instinct of self-preservation, and we can hardly imagine a more dreadful experience than having a train move toward one on the track who is in close proximity .to it. In accelerating the vehicle to' get off the track, the driver reacted only as any normal human being would have in similar circumstances.”
In the Ernst case, we cited the unreported case of Andrus v. New Orleans, Texas & Mexico Railway Co., decided by the Court of Appeal, First Circuit, in 1921, No. 600 (writs refused by the Supreme Court, No-. 25,233), wherein a passenger leaped from an automobile, believing that it would be struck by a loose box car. It was held in the Andrus case that the railroad’s negligence created a dangerous situation causing the passenger to make the leap. Recovery was allowed, the court saying: “ * * * she was under the honest belief that she was in imminent danger, which was produced by the negligence of defendant company. . She. acted with, ordinary care as would have acted any normal person situated under similar circumstances, and her case falls within the emergency rule as has been recognized by many authorities. See Ruling Case Law, 20. P. 134, Et Scq. Borrows on Negligence P. 40.”
In neither of the cited cases did the train strike the vehicle. Patrick was in real danger, because if he had remained in his position on the stringer the lumber would have struck him, and he had more reason •to react as he did than the truck driver in the Ernst case or the automobile passenger in the Andrus case.
Defendants, after denying negligence, plead in the alternative that Patrick was-guilty of gross negligence-which contributed to his death. Counsel argue that balsa wood was frequently unloaded, and that Patrick should have known that buckling of the wood, causing noise and commotion, was not unusual, and that he should not have stood in a precarious position on the defective stringer in the immediate area of the unloading activities, as caution dictated that he remain on the wharf itself.
The United States was then in a state of war, and the duties of watchmen embraced multifarious functions. Exactly what duty Patrick was performing was known only to him, and the knowledge of it has passed to the Great Beyond. Some of the witnesses say that he was looking down into the hold of the vessel, while others are sure he was facing the wharf looking toward the warehouse. We have pointed out that, watchmen were given special and specific orders to be alert and on guard against fires, theft, pilferage, sabotage, disturbances, etc. Patrick did not position - himself near the •swinging boom, which indeed would hare been dangerous; on the contrary, his position on the stringer was a safe distance *197 from the boom and the point at which the wood was deposited on the dollies. The employees of T. Smith & Sons, Inc., were unanimous in declaring that while balsa wood shifts, it never falls. How then should Patrick have anticipated that the particular load would do the unusual and fall and roll to the stringer on which he was located?
In Gremillion v. American Creosote Works, La.App., 14 So.2d '72, 75, decided by us, an inspector employed by the United States Government sustained physical injuries while inspecting crossties prepared for the government at defendant’s plant. Gremillion, assigned to the plant, was under the duty of seeing that the requirements of the contract were met, and it was proper for him to watch each tie as it passed through the adzing machine. The crossties were then loaded onto a tram. He was standing on the ground between the track on which the adzing machine was located -and that on which the tram was placed, with his back to the tram. One of the ties fell from its position on the tram and struck Gremillion in the back, causing unjuries for which recovery was allowed. One of the defenses was that the plaintiff should have been aware of the danger in the position in which he had placed himself, and that in assuming and remaining in that position he was negligent. We answered that defense as follows: “ * * * Even if he might have stood in some other place, if he found this position convenient and if from the facts with which he was familiar, there was not sufficient danger to justify the conclusion that an ordinarily prudent person would not have remained there — then he was not guilty of contributory negligence in remaining there himself. And we have already said that We. do not find that such a reasonably prudent person might not have stood just where he stood.”
That is the exact situation we find .here.
There remains for our consideration only the question of quantum. Patrick earned a salary of $212.04 per month,' or $2544.48 a year. His age was forty-seven years, his life expectancy twenty-three years. Surviving him were his widow and'four minor children ages 18, 16, 14%,' and about 12. the court awarded the widow $10,000.00 individually, $2500.00 for the eldest child, and $3000.00 for each of the three other children. Plaintiff, by way of answer to the appeal, prayed that the judgment be'increased to the amount claimed in the petition.
In Alford v. Louisiana & Arkansas Ry. Co., La.App., 38 So.2d 258, the decedent was forty-eight years of .age, and was earning about $225.00 per month; his life expectancy was in excess of twenty-two years. Those factors, together with loss of support, companionship, love, care, and protection were taken into consideration in affirming the judgment of the district court, which allowed the widow individually the sum of $10,000.00, and as natural tutrix for three minor children the sum of $5000.-00 for each.
In Bergeron v. Saia, La.App., 37 So.2d 866, the deceased husband and father was forty-two years old and earned $240.00 per month. The widow and children collectively recovered $31,555.55 in the trial court, but the appellate court reduced the widow’s individual award to $10,550.00, and allowed $2500.00 to each of the three minor children. The court took into consideration the fact that the defendant, a man of limited means, who carried liability insurance for only the sum of $10,000.00, was not financially able to respond to a larger judgment.
The amount of $15,000.00 was awarded to a widow for deprivation of the companionship and love of her husband, and for loss of support, in Short v. Central La. Elec. Co., La.App., 36 So.2d 658.
The decedent, in Tolle v. Higgins Industries, Inc., 212 La. 173, 31 So.2d 730, was sixty years old, had a life expectancy of fourteen years, and earned not much more than $50.00 per week. His widow recovered $12,000.00, and the minor child, age 16, was allpwed' $70QO.OO.1
In assessing the amount of damages in cases such as this, courts 'have always .taken into consideration the earning capacity of *198 the decedent, his age, life expectancy, and other surrounding circumstances.
Plaintiff and her deceased husband had been married twenty-four years, and the family depended upon Patrick for support. The only property owned by either the husband or wife was the small cottage inherited by Mrs. Patrick, in which the family lived. Mrs. Patrick testified that her husband worked seven days each week, and that he turned over to her the whole of his earnings on paydays. According to her, Patrick was a kind and dutiful husband and father.
We believe that the award made by the trial court is inadequate. We realize that the widow and children cannot be amply compensated for the untimely death of their husband and father by any monetary judgment, but weighing all of the aspects of the case, we conclude that the judgment should be increased to the following extent: to the widow individually, $12,500.00; to the child Miriam, $3000.00; to the child Ernest, $4000.00; to the child Etta Joyce, $4000.00. We make no increase in the award to Ruby Patrick, as we feel that the $3000.00 awarded to her is ample. The aggregate of our judgment is $26,-500.00, and considering the $4500.00 compromise with the Texas Pacific — Missouri Pacific Terminal Railroad Company, the Patrick family has recovered the sum of $31,000.00.
Since the trial of the case, Miriam Patrick, who is now the wife of John Vega, III; Ruby Patrick, now the wife of Alvin T. Hogan; and Ernest W. Patrick, Jr., have reached the age of majority, and as they have by motion made themselves parties to this appeal, the judgment so far as they are concerned must run in their favor individually.
For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be amended so as to allow Mrs. Hilda Lee Patrick the sum of $12,-500.00; Miriam Patrick Vega, $3000.00; Ruby Patrick Hogan, $3000.00; Ernest W. Patrick, Jr., $4000.00; and Mrs. Hilda Lee Patrick for the use and benefit of her. minor child, Etta Joyce Patrick, $4000.00; all amounts to bear legal interest from judicial demand. As thus amended, and in all other respects, the judgment appealed from is affirmed.
Amended and affirmed.