168 So.2d 107 (1964)
John P. DOWLING
v.
The MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, United States Fidelity and Guaranty Company, Aetna Casualty and Surety Company.
No. 1220.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 1964.
Rehearing Denied November 2, 1964.
Writ Refused January 18, 1965.
*108 Donald V. Organ, New Orleans, for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre and Ernest A. Carrere, Jr., New Orleans, for Mut. Life Ins. Co. of New York, defendant-appellee.
Adams & Reese, Richard C. Baldwin and Sam A. LeBlanc, III, New Orleans, for Aetna Cas. & Surety Co., defendant-appellee.
Before YARRUT, SAMUEL and BARNETTE, JJ.
CHRIS T. BARNETTE, Judge pro tem.
This is a suit in tort for damages on account of the alleged negligence or malpractice of plaintiff's physician in his alleged failure to inform him of the results of an *109 X-ray examination and the warning of the radiologist that there was an abnormal condition in his lung which might be indicative of tuberculosis requiring further radiological examination for more accurate diagnosis.
It is alleged that because of the failure of the physician to so inform him and to instruct him to have further X-ray examination within the time recommended, a tubercular infection, which did in fact exist, was not detected until some 19 months later by which time it had progressed in activity to such extent that a long period of hospitalization and major surgery became necessary. Plaintiff's case is based upon the contention that a timely discovery of the tuberculosis would have made possible early treatment, thus avoiding the necessity for prolonged hospitalization and the ultimate lobectomy.
Of the four original defendants, one, John B. Keenan, was dismissed on plaintiff's motion before trial; another, Mutual Life Insurance Company of New York, was dismissed on exception of no cause or right of action sustained before trial. The case went to trial before a jury against Aetna Casualty and Surety Company, the insurer of Dr. Alfred P. Longacre, plaintiff's physician, and United States Fidelity and Guaranty Company, insurer of Dr. J. N. Ane, radiologist. After trial but before submission to the jury, the defendant United States Fidelity and Guaranty Company was dismissed on voluntary motion of plaintiff, and the case went to the jury only as against the Aetna.
There was a verdict for defendant, rejecting plaintiff's demands. He has appealed from that judgment and the judgment of the court maintaining the exception of no cause or right of action filed on behalf of Mutual.
The plaintiff, John P. Dowling, was the private patient of Dr. Alfred P. Longacre in the years 1951, 1952 and 1953, during which time he was treated for minor illnesses, such as colds, bronchial infections, etc. In the course of these treatments Dr. Longacre referred him to Dr. J. N. Ane for X-ray examinations, November 28, 1951, and October 15, 1952, and on each occasion the report was essentially negative. On April 2, 1957, Dowling returned to Dr. Longacre with complaint of chest pains. After performing a physical examination, in an abundance of precaution, Dr. Longacre directed him to a specialist for an electrocardiogram to rule out heart involvement. This EKG was reported negative. He also referred him to Dr. Ane for chest X-ray. The next day, April 3, Dr. Ane delivered by messenger, as was his custom, the X-ray plate and a report to Dr. Longacre, containing among other things the following:
"There is a small patchy area of infiltration and fibrosis in the left anterior first interspace. This is suggestive of a very slight old tuberculous infiltration involving the left upper lobe. Re-ray and comparison in about three or four weeks would be advisable to eliminate an acute non-specific pneumonitis."
It is contended by Dowling, but disputed by Dr. Longacre, that this information, this warning, this recommendation for further X-ray examination in three or four weeks, was not communicated to him. On the contrary, Dowling alleged that Dr. Longacre reported to him a few days later in a telephone conversation that the reports were negative and that his discomfort was caused by an accumulation of gas, a relatively minor and temporary condition. This disputed contention presents a question of fact of great importance to the issues involved. It will be discussed in more detail later.
On May 27, 1957, Dowling returned to Dr. Longacre, not as a private patient, but for a physical examination in connection with an application for life insurance with Mutual Life Insurance Company of New York. Sometime between April 2 and May 27, Mr. Dowling was solicited for insurance *110 by John B. Keenan, agent of Mutual, and since another child had been born to him and his wife in May, he was interested in further insurance. He agreed to take a policy for $25,000.00. It is not material whether Dr. Longacre was chosen by Mr. Dowling from among several doctors suggested or selected by the insurance company as its examining physician, but the fact of his having made the examination on May 27 is highly significant in the light of later developments.
Dr. Longacre, as the examining physician for Mutual, did not require an X-ray, nor does it appear that any reference was made to the one made seven weeks earlier. There is nothing in the record to indicate that there was any discussion between him and Dowling at that time of the April 3 report of Dr. Ane. The examination was routine and a report was made to Mutual on forms provided by it, which among other things contained the following significant questions and answers:
"33. Is there any evidence or history of past or present disease, injury or functional disturbance of

* * * * * * * *
"D. Lungs, Bronchi, Larynx?
"[Answer] No.

* * * * * * * *
"38. Do you know anything in connection with Insured's physical condition, family history or past health not already recorded which would affect his (her) insurability?
"[Answer] No."
In due course Mutual wrote a life insurance policy on Mr. Dowling for $25,000.00, and on the basis of his application and the examination made, offered him an additional $20,000.00 which he declined to take.
In August, 1957, Mr. Dowling went to Dr. Jerome G. Block for examination and treatment occasioned by chest pains. Mr. Dowling was fearful of a cardiac condition or lung cancer and sought the services of Dr. Block, a specialist in internal medicine and cardiology. Dr. Block's examination included a fluoroscopy which revealed nothing of great significance. He continued under treatment of Dr. Block until the latter moved to Miami in October, 1958, leaving his New Orleans patients in the hands of other doctors, including Dr. Mignon Jumel, to whom Mr. Dowling was referred. His clinical case record on Mr. Dowling was turned over to Dr. Jumel. Her first entry in the record is November 7, 1958, when she was called by Mr. Dowling on the day of his father's funeral, complaining of fainting spells and fearful of heart trouble. Examination revealed nothing alarming. The electrocardiogram was negative.
In the latter part of November, 1958, Mr. Dowling again contacted Dr. Jumel for examination following an incident in which he was fearful of having swallowed a splinter of wood. An X-ray was suggested, to which Dowling readily submitted. The next day, November 20, the X-ray was made by Dr. Ane, and on November 21, he submitted his report to Dr. Jumel which included the following:
"There are several patchy areas of infiltration involving the left apex, first and second anterior interspaces.
"Comparison with previous films of 4/2/57 shows a rather definite and a somewhat marked spread of the infiltration.
"There are several linear areas of discoid atelectasis in the left lower lobe. The right pulmonary field is clear.
"IMPRESSION: Tuberculous infiltration involving the left upper lobe with a definite spread since the examination of 4/2/57."
Thereupon Dr. Jumel called Dowling and performed other tests which verified the diagnosis of active tuberculosis.
*111 Mr. Dowling was hospitalized immediately and after several weeks of treatment at Veterans Hospital a lobectomy was performed. After a period of convalescence Dowling gradually resumed his practice of law but with a curtailment of general activity.
It is plaintiff's contention that had he been told of the warning sounded by Dr. Ane on April 3, 1957, or had been told that a further X-ray examination was recommended he would have followed through as directed and the tuberculosis would have been detected in its early stages. He contends that at this stage the infection was minimal and would have responded to treatment; that it could have been brought under control or arrest, thus reducing its gravity and eliminating the necessity of prolonged hospitalization and ultimate major surgery.
The questions presented are as follows: (1) Did Dr. Longacre inform Dowling of the report of Dr. Ane of April 3, 1957, and advise him of the recommendation that a re-ray and comparison be done in three or four weeks? This is a question of fact. (2) Did Dowling reject the advise of Dr. Longacre and seek the services of another physician? This is a question of fact. (3) If Dr. Longacre failed to communicate the substance of the report of April 3, 1957, to Mr. Dowling and did fail to alert him to the possibility of a tubercular infection indicating the need of a re-ray in three or four weeks for comparison, was such omission an act of negligence for which legal liability is imposed? This is a question of law. (4) If there was a negligent act of omission for which a legal liability is imposed, what difference, if any, resulted with respect to the treatment of the disease? This is a question of fact. (5) Assuming liability on account of a negligent act of omission by Dr. Longacre, was such imputable to the defendant Mutual Life Insurance Company of New York? This is a question of law.
We shall answer the last question first. In the first place Mutual was under no obligation to report to Mr. Dowling the result of its physical examination of him incident to his application for insurance. Such examinations are made for the information of the insurer to determine insurability, and not for the information of the applicant. Furthermore, it is our opinion that the relationship between Mutual and Dr. Longacre in regard to the insurance examination May 27, 1964, was one of contract, or engagement to render a service as an independent contractor.
The general rule is that there is no vicarious liability upon the employer for the negligence of an independent contractor. This rule is subject to some exceptions which are not applicable in the present case. Prosser on Torts, Second Edition, § 64, p. 357.
The most commonly accepted reason for the rule is that, "since the employer has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and administering and distributing it." Prosser, supra, § 64.
In Ford v. Louisiana & A. Ry. Co., 196 So. 403 (La.App.2d Cir. 1940), the Court stated:
"Cases involving the principle here discussed have frequently arisen in different jurisdictions of the United States. The overwhelming weight of authority is that the relation of principal and agent or master and servant is not superinduced under similar state of facts. On the contrary, the physician or surgeon occupies the position of independent contractor for whose acts of negligence or error in diagnosis, etc., the employer is not responsible in damages. However, for the employer to receive the full protection which *112 this relation otherwise secures to him, it must appear:
"(1). That in selecting the physician, the employer exercised ordinary care, which means that the physician is, at least, of average skill and ability, and
"(2). That the employer does not derive profit from the retention or selection of the physician or surgeon whose services are rendered to the employee."
The Court further said in that case:
"* * * The sort of profit the courts have in mind in cases of this kind, is that which directly devolves upon the employer from the services of the physician. For example, in return for selecting a certain physician, if that physician should share with the employer the compensation received by him for his services, this would be a profit flowing from the selection. If the employer had some interest or ownership in a hospital to which all of his injured employees were sent for treatment and was paid a percentage of the income or earnings of the institution derived from such cases, this would also be a profit."
Whatever negligence by omission or otherwise of the doctor is not imputable to Mutual. Pitre v. Peltier, 122 So.2d 867 (La.App.1st Cir. 1960). Dr. Longacre chooses his own patients and is not obligated nor subjected to direction or control by Mutual, except to discharge in his own professional way the duty for which he is engaged in each individual case. He received a fixed fee of $7.50 for the examination only.
We quote with approval from Ravare v. McCormick & Co., 166 So. 183 (La.App.2d Cir. 1936):
"`What is an independent contractor? It is defined as "one who is rendering services, an independent employment or occupation, and represents the employer only as to the results of his work, and not as to the means whereby it is to be done." 39 C.J. § 1517, p. 1315. The most generally applied test of the relationship is the "right of control as to the mode of doing the work contracted for." Ibid. § 1316; Faren v. Sellers, 39 La.Ann. 1011, 3 So. 363, 4 Am.St.Rep. 256; Gallagher v. Southwestern Exposition Ass'n, 28 La.Ann. 943.
"`The circumstances which go to show one to be an independent contractor are the "independent nature of his business, the existence of a contract for the performance of a specified piece of work, the agreement to pay a fixed price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials and his right to control the work while it is in progress." 39 C.J. p. 1316, § 1517. * * *"
As a physician, the independent nature of Dr. Longacre's work cannot be disputed, "There is no more distinct calling than that of the doctor, and none in which the employe is more distinctly free from the control or direction of his employer." Pearl v. West Enden Street Railway Co., 176 Mass. 177, 57 N.E. 339. Dr. Longacre was paid a flat sum for the specific examination. The doctor had complete control over the examination, the only requirement of Mutual being that he fill out and return a form provided by it.
Under the standard and applicable tests as set out in the Ravare case, supra, it is clear that Dr. Longacre was an independent contractor for the purposes of the insurance medical examination given Mr. Dowling at the request of Mutual. Obviously Mutual had no information, nor reason to suspect that the applicant for insurance might have had tuberculosis. It is a matter of common knowledge and one of which *113 the Court might take judicial notice, if necessary, that insurance companies would not knowingly accept for life insurance an applicant with a possible tuberculosis infection, at least, without further procedures as outlined by Mutual's staff physician, Dr. Theodore Plucinski, as recorded in the deposition of this witness. Knowledge of the independent professional practitioner, withheld from Mutual, is not imputable to it under the doctrine of respondeat superior. The relationship of master and servant or principal and agent did not exist. Great American Indemnity Co. v. Fleniken, 134 F.2d 208 (C.A.La.); Robideaux v. Hebert, 118 La. 1089, 43 So. 887.
The judgment sustaining the exception of no cause or right of action and dismissing the case against Mutual Life Insurance Company of New York is correct and must be affirmed.
The first question, in the order listed above, contains the principal issue of fact in this case. We do not have the benefit of the categorical findings of the jury and do not know if the verdict rejecting plaintiff's demands is based upon an affirmative answer to this question or upon one or more of the other questions presented. We are not unmindful of the great weight of jurisprudence in this state that findings of the trial court or jury on questions of fact should not be disturbed in the absence of manifest error. Whatever the finding of the jury might have been on this point cannot be accepted as valid since certain material factual information was excluded from its hearing and consideration. We think it was error on the part of the trial judge to exclude all testimony and other offerings relating to the May 27, 1957, examination for Mutual by Dr. Longacre. It makes no difference that Mutual had been dismissed before trial on exception of no cause of action and was no longer a party defendant in the case before the jury. This apparently was the reason given for excluding this testimony. The testimony was material and relevant and should have been admitted. It throws a great deal of light on the disputed issue involved in this question.
Dr. Longacre testified that he did advise Mr. Dowling of the substance of the April 3 report from Dr. Ane and did recommend further X-ray examination. This Mr. Dowling flatly denied saying that on the contrary he was told the reports were negative and that he was "okay" and that nothing was said about a re-ray. Furthermore Mr. Dowling testified that at no time after April 3 did Dr. Longacre discuss the report of Dr. Ane with him with any reference to tuberculosis or recommendations made by Dr. Ane. This would include any conversation or discussion they might have had on May 27, when he appeared for the insurance examination. It is incredible to assume and we cannot believe that a discussion of this subject could have taken place between them at any time within the seven-week interval, in the light of Dr. Longacre's report to Mutual that there was no "evidence or history of past or present disease, injury or functional disturbance of * * * [Mr. Dowling's] lungs * * *." (Emphasis ours.) In this connection the May 27 report of Dr. Longacre to Mutual is very relevant to a prime issue in the case and is admissible for the purpose of corroborating Mr. Dowling and impeaching the doctor.
"When a witness has testified to facts material in the case, it is provable by way of impeachment that he has previously made statements relating to these same facts which are inconsistent with his present testimony.3" McCormick, Evidence § 34, p. 63 (1954).
3. Any form of statement is acceptable. It may have been made orally, may have been taken as testimony at another trial or by deposition, or in writing, as a letter, accident report or witness-statement or affidavit, or in any other form."
Galiano v. Ocean Accident and Guaranty Corp., 55 So.2d 641, (La.App. Orleans 1951).
*114 Dr. Longacre is a physician of eminence and enjoys a reputation of professional integrity. It is extremely unlikely that he simply forgot about the April 3 report within seven weeks, or that he did not remember Mr. Dowling in that connection. Their personal and professional acquaintance was such as would have prompted some discussion or mention of this report or perhaps an inquiry by Dr. Longacre of Mr. Dowling if he had followed through with the recommendation for further X-ray examination. The only logical conclusion is that Dr. Longacre did not know of the report of Dr. Ane of April 3. We can only assume that it never reached his hands personally or in some manner escaped his attention and perhaps was filed in Mr. Dowling's clinical record without the doctor's knowledge of its contents. Whatever the fault or explanation, it was one of negligence of the doctor or one of his employees, rather than from any want of professional skill or error of diagnosis.
The second question above enumerated we think should be answered in the negative. From the record as a whole, it is obvious that Mr. Dowling was a very apprehensive person, fearful of heart trouble or lung cancer. He was quick to call his doctor at every indication of significant symptom. The fear of tuberculosis was never communicated to him until it was definitely diagnosed by Dr. Jumel in November, 1958. Any suggestion of tuberculosis would have caused him great anxiety and he would have sought immediate consultation or treatment of a specialist, as he in fact did as soon as tuberculosis was first indicated. His visit to Dr. Block on August 28, 1957, and treatment by him thereafter, was prompted by his apprehensiveness over the persistance of chest pains and Dr. Block's skill as an internist and cardiologist. This could not conceivably be construed as a rejection of professional advice or recommendation of Dr. Longacre, who is primarily a surgeon. Rather, in fact, it appears that he went to Dr. Block because Dr. Longacre had given him no advice nor recommendation to follow. Certainly it could not be said that he rejected professional advice and recommendation if none were given.
The following extracts from the transcript of testimony, pp. 270-272 and pp. 354-355, we think are significant:
"THE COURT: [To defendant's witness Dr. Louis Monte]
"Yes. All right. Now, in the event you were the patienta patient came to you and you had an X-ray made, such as this one that was made on the 2nd or 3rd of August, April, 1957, and you examined that X-ray and you instructed the patient to return or to come back so that you may have another X-ray taken and he didn't come back, is there anything you could do about it?
"A Yes. If youyou mean by force?
"THE COURT:
"Yes.
"A No.
"THE COURT:
"Well, what could you do other than by force?
"A If you kept the records in such a fashion that you would be reminded that this individual didn't keep his appointment, you would notify him to that effect. That is as far as you can go. Now, I'm afraid I might have misunderstood you. You might have been alluding to a diagnosis of tuberculosis?
"THE COURT:
"That's right.
"A If I suspected tuberculosis and was reasonably sure that he did have tuberculosis and he failed to come back, then I think it would *115 be my duty and obligation to report that to the Health Department so that they can further investigate him.
"THE COURT:
"To see if he had tuberculosis. Now, suppose that that patient then placed himself in the hands of another physician who was presumably an expert in tuberculosis and chest conditions, is there anything you could do then?
"MR. ORGAN:
"I'm going to have to object to that because there is no evidence in the record whatever that he placed himself in another physician's hands for the possibility of treatment of tuberculosis. That is a hypothetical question which there is no evidence in the record of it.
"THE COURT:
"I am not commenting on the evidence, but your objection is overruled.
"Presume that he placed himself in the hands of another physician who was qualified insofar as tuberculosis and the chest disorders, what would you have done then?
"A I don't think there would be any need to do anything, Your Honor.
"THE COURT:
"That's correct. In other words, if he took himself out of your hands and placed himself in someone else's hands, a physician, there wasn't anything else you could do?
"A That's right.
"THE COURT:
"Okay."
And from the judge's charge to the jury:
"I charge you, gentlemen, that insofar as Dr. Longacre is concerned, according to the testimony on this case, which you folks evaluate, and the Court is not commenting on the evidence in any way, if the plaintiff in this case was instructed to return for further X-ray examination, which the record may disclose that he did not do, then you could not hold that the doctor is liable for malpractice, or the doctor's insurer, for any damages that he suffered. (Emphasis added.)
"Should you find from the evidence in this case that the plaintiff did not follow the instructions of the physician and surgeon, then under that condition, the surgeon would not be held responsible for any resultant damage that may have accrued.
"I further charge you, gentlemen, that in the event plaintiff in this case did not rely upon the diagnosis of the surgeon of his choice, in other words, Dr. Longacre, but sought other medical assistance and care, he could not hold the surgeon responsible for the diagnosis upon which he did not depend. * * *"
There was no factual basis for the hypothetical questions by the court and its charge to the jury was improper. Muscarelli v. Hodge Fence & Lumber Co., 120 La. 335, 45 So. 268. The implication conveyed by these questions and charge is strongly suggestive to the jury that Dr. Longacre had advised the plaintiff concerning the possibility of tuberculosis and the need of further X-rays and that the plaintiff rejected this advice and sought another physician. This was error and could have influenced the jury's verdict to the prejudice of plaintiff's case. LSA-C.C.P. art. 1792.
*116 Having found that Dr. Longacre did not in fact communicate to Mr. Dowling the substance of Dr. Ané's report of April 3, 1957, and that he did fail to alert him to the possibility of tuberculosis and the need of further X-ray examination, we must now determine if such failure is actionable in tort.
It is so well established in the jurisprudence of this state as not to require citation of authority that persons are liable for acts of omission under LSA-C.C. arts. 2315 and 2316, as well as for acts of commission. This liability, however, does not rest alone upon a mere failure or omission, but there must also be a duty imposed by the relationship of the parties which would be breached by such act of omission. This requires us to examine the relationship between Dr. Longacre and Mr. Dowling, the relationship of physician and patient. The duty imposed by this relationship is stated by the Supreme Court of Louisiana in Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, in the following language:
"* * * As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. * * *" (Citing numerous authorities.)
See also Morgan v. Aetna Casualty & Surety Company, D.C., 185 F.Supp. 20 (1960), wherein the Federal Court adopted and applied this rule. Prosser on Torts, Second Edition, p. 134.
On this point we have the testimony of four doctors of good standing in the New Orleans area and Dr. Jerome G. Block, now of Miami, formerly of New Orleans. Their testimony is to the effect that in a like situation they would have informed the patient of the report of the radiologist and impressed upon him the serious implications involved. Three of them, Dr. Philip H. Jones, Dr. Louis Monte, and Dr. Block, called as defense witnesses, testified under cross-examination at some length outlining the series of tests which they would have made upon receipt of such a report as that of Dr. Ane of April 3, 1957, or upon suspicion of tuberculosis. It is our opinion that their eminence and professional skill fully qualify them to testify as to the standard of professional skill and diligence which might be expected of other members of the profession in the local community.
Applying the rule stated in Meyer v. St. Paul-Mercury Indemnity Co., supra, we must conclude that Dr. Longacre owed to Mr. Dowling the duty to inform him of the substance of Dr. Ané's report of April 3, 1957. A perfect opportunity was afforded for him to make inquiry if Dowling had had the additional X-ray examination and the result thereof, on May 27, when Mr. Dowling came to him for an insurance examination. Such an inquiry was of much importance in connection with that examination. We are convinced from the testimony of the witnesses and the report of the doctor to the insurance company that the subject was not discussed between them. His failure in this respect was a breach of duty imposed by the relationship of physician and patient. This is actionable in tort under the authority of LSA-C.C. arts. 2315 and 2316.

"Negligence on the part of a physician has been said to consist in his doing something which he should not have done or omitting to do something which he should have done, or his failure to exercise the required degree of care, skill, and diligence." 70 C.J.S. Physicians and Surgeons § 40, p. 946.
An unusually close parallel to this case is United States v. Reid, 251 F.2d 691 (5th Cir., Miss.1958). So strikingly similar are the facts and the final conclusion of the Court on the question of liability that *117 we think it is pertinent to quote from the Court's opinion the following:
"The facts, overwhelmingly supported, found by the District Court may be briefly put. Reid, a civilian employee in the laboratory of the Army Hospital at Fort Benning, Georgia, was entitled to medical treatment under the Civilian Employees Health Program * * *. On March 7, 1949, after describing pains in his chest and back to his superior, Dr. Lowe, Chief of the Laboratory Services, Reid requested that X-rays be taken. This was done. On March 10, Dr. Lowe, at the time he gave to Reid the written report from the Radiologist which Reid never examined until months later, told him `* * * that there was nothing wrong with him, as shown by the X-ray report * * *.' Actually the Radiologist had `* * * indicated that * * * [Reid] in 1949 had minimal tuberculosis * * *.' And consequently `Dr. Lowe was guilty of negligence in failing to advise * * * [Reid] * * * in March 1949, that he probably had incipient tuberculosis.' Had the X-ray report been properly evaluated, further examination and tests would have been undertaken to determine Reid's actual condition and proper treatment including prolonged rest would have been recommended. Therefore, `Dr. Lowe was negligent * * * in not making further examination and tests to determine his condition; and if he had done so he would have found that [Reid] was suffering with incipient tuberculosis and would have given him the proper treatment.'
"Reid, `* * * not knowing that he had incipient tuberculosis, did not seek hospitalization until his condition became worse, and in 1950 his condition having become worse and * * * [Reid] realizing that there was something wrong with him sought further examinations, and at that time it was determined that he had advanced tuberculosis and that treatment was immediately necessary.' However, Reid `* * * did not discover Dr. Lowe's negligence, nor did he discover his physical condition until February 16, 1950; * * *.'"
The main issue in this case was not so much the breach of duty and resultant liability, but the question of application of the statute of limitations. That, too, was resolved in plaintiff's favor and recovery was allowed.
The only remaining question is: Did this breach of duty cause injury to the plaintiff? Stated in other words, did this breach of duty cause plaintiff's tubercular infection to become more serious resulting ultimately in the need of major surgeory which could have been avoided by timely treatment? If so, to what extent would plaintiff have been incapacitated during such treatment? How long would early treatment have been required? Could he have been treated as an ambulatory patient or would hospital care and inactivity have been required? To what extent would he have had a loss of income and been deprived of association with family? To what extent would physical and emotional suffering have been reduced? What expenses would have been incurred in early or prolonged treatment? These and other collateral questions have an important bearing on the extent of damage, if any, sustained as a result of the doctor's breach of duty. Is this a case of injuria sine damnum?
"One who is injured by malpractice [or negligence] is entitled to compensation for all pecuniary losses which he has sustained as a direct and natural result thereof. Particular elements of compensation may include loss of time, loss of services, impairment of earning capacity, expenses actually incurred, bodily pain and mental suffering, and the condition or circumstances of the injured person. No recovery can be had for losses which do not result naturally and directly from the breach of *118 duty proved. A physician or surgeon is liable only for the loss caused by his malpractice [or negligence], and not for that caused by the patient's original illness or injury or aggravation thereof caused by others than defendant. Recovery may be had for prospective damages which are reasonably certain to occur, as well as accrued damages. * * *" 70 C.J.S. Physicians and Surgeons § 67, p. 1020.
There is some testimony in the record to the effect that an early diagnosis would have been very beneficial in that there was a possibility that the infection might have responded to chemotherapy. This testimony is not conclusive and falls far short of answering all the collateral questions involved. We do not believe a just award of damages can be given on the testimony in the record before us. Justice demands that the case be remanded for further testimony on this point and such further proceedings as may be necessary to the end that a proper judgment can be found consistent with the views herein expressed.
The judgment appealed from maintaining the exception of no cause or right of action dismissing the action against Mutual Life Insurance Company, defendant-appellee, is affirmed. The judgment rejecting demands of plaintiff-appellant, John P. Dowling, against defendant-appellee Aetna Casualty and Surety Company is annulled and set aside and the case remanded for further proceedings consistent herewith. The defendant-appellee Aetna Casualty and Surety Company is cast for costs of this appeal; all other costs to be assessed in accordance with final judgment herein.
Affirmed in part; annulled in part; and remanded.